## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ANTERO RESOURCES CORPORATION,**

> **Plaintiff,**

**v.**

**TEJAS TUBULAR PRODUCTS, INC.**, *et al.*,

> **Defendants.**

:

:

:

**Case No. 2:19-cv-804**
**Judge Sarah D. Morrison**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on the motions for summary judgment filed by Defendants Ken Miller Supply, Inc. and Ken Miller Supply of W. Va., Inc. (together, "KMS"), and by Tejas Tubular Products. (ECF Nos. 94, 101.) The motions are ripe for ruling.[1]

## I.    BACKGROUND

This case deals with the fallout from a failed horizontal "fracking" oil well. Plaintiff Antero Resources Corporation's Wehr 3H well lost pressure after steel production casing ruptured during a pressure test. Production casing is used to maintain hydraulic pressure inside this type of well. Antero believes the casing failure occurred because of a manufacturing defect resulting in casing that was

---

[1]Tejas has requested oral argument. (ECF No. 101.) Because the Court does not believe oral argument would be helpful, that request is **DENIED**.

noncompliant with the required American Petroleum Industry ("API") 5CT specifications.

KMS, a distributor of oilfield supplies including tubing and casing products, supplied the casing to Antero for use in the Wehr 3H well. Tejas manufactured the casing. KMS and Tejas deny any liability to Antero.

### A. The Contracts

There are five separate contracts at issue. Four of the contracts are between Antero and KMS, and one is between KMS and Tejas.

*Work Order*. To complete the Wehr 3H well, Antero issued a Request for Quote ("RFQ") seeking a supply of, among other products, casing that met API 5CT specifications. (ECF No. 79-1, RFQ, PageID 1299–1310; ECF No. 80-4, Waltz Dep., PageID 2120–21, 2281–82.) Antero's RFQ required a manufacturer's warranty on all products supplied. (RFQ, PageID 1304–07.)

KMS responded to the RFQ and represented that it could fulfill Antero's requirements. (RFQ, PageID 1310.) Tejas would manufacture and KMS would supply the casing to Antero. (ECF No. 79-1, PageID 1288–91, 1306–07.) Antero and KMS then executed a Work Order that incorporated the RFQ's product specifications and warranty requirements – including a representation by KMS that the casing was warranted by the manufacturer, Tejas. (See, RFQ, PageID 1299–1307; ECF No. 100-3, Work Order, PageID 12212–17; ECF No. 79-1, Dye Dep., PageID 1101–04.) Relevant here, KMS agreed to supply:

> 5.5 [inch] P-110-pipe to be certified to meet API specification 5CT with supplementary requirement SR16 and that no pipe is to have yield

2

strengths exceeding 140,000 pounds. There has to be a process where [KMS] regularly inspect[s] the casing (a third party not associated with the tubular provider is preferred) and randomly test[s] casing properties to validate they are conforming to API specification 5ct w[ith] sr16.

(RFQ, PageID 1307; Work Order, PageID 12216.)

*Master Services Agreement*. Antero and KMS then entered into a Master Services Agreement ("MSA"). (ECF No. 1-1, MSA.) The previously executed Work Order was incorporated into the MSA. (*Id.*, PageID 15.)

*Sales Order Confirmation*. KMS then contacted Tejas and placed an order for the required casing. (ECF No. 81-1, Sales Order Confirmation, PageID 2883.) KMS told Tejas that the casing was for resale to Antero, so Tejas knew that Antero was the end user. (ECF No. 78-1, Khandavelli Dep., PageID 468–49; ECF No. 79-1, Dye Dep., PageID 1122; ECF No. 81-1, PageID 2890.)

According to the Sales Order Confirmation, Tejas agreed to "[p]rocess [the casing] per API 5CT Latest Edition Specifications." (Sales Order Confirmation, PageID 2883.) Tejas was to perform various inspections and tests on the casing to ensure conformance with Antero's specifications. (ECF No. 81-1, PageID 2888–2901; See generally, ECF No. 101, Tejas Mot., PageID 13353–54 (citing inspection and test results).)

*Sales Order*. KMS and Antero subsequently executed their own Sales Order memorializing Antero's purchase of the casing. The Sales Order included pricing and limited remedy and warranty disclaimer provisions. (ECF No. 80-4, Sales Order, PageID 2291–92.)

*Partial Settlement Agreement*. After the production casing ruptured, KMS and Antero entered into a partial settlement agreement in which KMS paid Antero $1,200,000, subject to a refund if Antero is later satisfied that KMS, Tejas, and any third parties are not liable for the casing failure. (ECF No. 1-2, Settlement Agreement, PageID 32.) Antero was required to provide information to KMS as requested and Antero agreed that it would not plug the well for a period of time. (*Id.*)

## B. The Casing Failure

After installing the Tejas casing into its Wehr 3H well, Antero ran a pressure test in preparation for operation. A 4-foot split occurred somewhere along a joint or the body of the casing. (ECF No. 91-1, Hansen Dep., PageID 8576; ECF No. 89-1, Malloy Dep., PageID 6150, 6172.) The casing, which Antero argues was supposed to withstand a 14,530-psi burst, failed at roughly 10,837 psi – 75 percent of its burst rating. (ECF No. 88-1, Mason Dep., PageID 5843–44.) The parties dispute whether API 5CT standards required the casing to withstand 14,530-psi; Tejas contends that it only had to *test* the casing up to 10,000 psi of pressure. (See, ECF No. 91-1, Hansen Dep., PageID 8616.)

The parties' experts disagree on the cause of the casing failure. Antero's primary expert, John Hadjioannou, believes that a manufacturing defect caused the casing failure. (ECF No. 90-1, Hadjioannou Dep., PageID 6708.) He opines that the culprit is a "cold weld," a defect that is "nearly indetectable, if not impossible to detect." (*Id.*, PageID 6689.)

4

Tejas's experts, on the other hand, believe that "fatigue" of the casing due to improper movement during installation caused the failure. (ECF No. 91-1, Hansen Dep., PageID 8577–78; Malloy Dep., PageID 6251–52.) They argue that the casing could have been damaged while being transported, stored, or prepared for installation. (Hansen Dep., PageID 8480–81, 8618–19.)

For its part, KMS argues that some error on Antero's part caused the failure. (See, ECF No. 94, PageID 9273.)

The one consensus among the experts is that it is difficult to determine the cause of the failure with certainty without retrieving the casing. (See e.g., Hansen Dep., PageID 8577; ECF No. 99-1, Luo Dep., PageID 10506–08; ECF No. 94, KMS Mot., PageID 9295 n.7.) Antero attempted and failed to retrieve the casing from the well. (ECF No. 80-4, PageID 2190.) But even without the casing, the cause of the failure can be investigated. Tejas expert Kenneth Malloy testified that in roughly 75 percent of his investigations the casing is not retrieved from the well, but he can still determine the likely cause of failure in each case – retrieving the defective casing is "just an added bonus." (Malloy Dep., PageID 6127–28, 6150.)

After the conclusion of the investigations, Antero determined that the Wehr 3H well was irreparable and did not take any further remedial action. (ECF No. 87-4, PageID 5597.) Roughly four years have passed since the initial casing failure, and Antero has received an order from the Ohio Department of Natural Resources requiring it to plug and abandon the well. (ECF No. 112-1, ODNR Order.)

### C. Procedural Background

Antero brought this suit against KMS and Tejas in March 2019. (ECF No. 1, Compl.) It brings claims against KMS for: Breach of Express Warranty (Count I); Breach of Implied Warranty in Contract (Count III); Negligence under the Ohio Products Liability Act (OPLA) (Count VII); and Supplier Nonconformance with Representations under the OPLA (Count VIII). Antero's claims against Tejas are for: Breach of Express Warranty (Count II); Breach of Implied Warranty in Contract (Count III); Breach of Implied Warranty in Tort (Count IV); Defect in Manufacture or Construction under the OPLA (Count V); and Manufacturer's Nonconformance with Representation under the OPLA (Count VI).

KMS filed its Answer and brought counterclaims against Antero for declaratory judgment that it is entitled to return of the settlement payment, breach of the partial settlement agreement, unjust enrichment, and conversion. KMS brought two crossclaims against Tejas for implied indemnity at Ohio common law and one for statutory indemnity under Texas law. (ECF No. 16.)

KMS has moved for summary judgment on all of Antero's claims against it and on its counterclaims and crossclaims. (ECF No. 94.) Tejas moved for summary judgment on all of Antero's claims against it and on KMS's crossclaims. (ECF No. 101.) The motions have been briefed by the parties. (ECF Nos. 111–14, 117–19.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

Because this action is before the Court under diversity jurisdiction, state law governs the substantive issues. *Issuer Advisory Grp. LLC v. Tech. Consumer Prod., Inc.*, No. 5:14CV1705, 2015 WL 458113, at *3 (N.D. Ohio Feb. 3, 2015) (citation omitted). The parties do not dispute that Ohio law governs Antero's claims and

KMS's counterclaims, so the Court applies Ohio law. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). As for KMS's crossclaims against Tejas, the parties dispute what state law governs, so the Court resolves that issue below.

## III.   KMS'S MOTION FOR SUMMARY JUDGMENT

### A. Analysis

#### 1.  Breach of Express and Implied Warranties (Counts I and III)

KMS argues that it made no express warranties to Antero and, even if it did, that it disclaimed all express or implied warranties. (ECF No. 94, KMS Mot., PageID 9279–81.) Because the Court finds that KMS disclaimed the express and implied warranties, it need not reach the issue of whether a breach occurred.

To determine whether KMS has disclaimed any warranties, the Court begins with the language of the contract to determine: (1) whether KMS expressly warranted the quality of the defective casing and, if so, whether it disclaimed that warranty; (2) whether implied warranties were disclaimed; and (3) whether the disclaimers are enforceable under Ohio law.

Contract interpretation is ordinarily a matter of law for determination by the court. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995). "The court's role in interpreting a contract is to 'give effect to the intent of the parties.' " *Fujitec Am., Inc. v. AXIS Surplus Ins. Co.*, 458 F. Supp. 3d 736, 743 (S.D. Ohio 2020) (Litkovitz, M.J.) (quoting *Goodyear Tire & Rubber Co. v. Lockheed Martin Corp.*, 622 F. App'x 494, 497 (6th Cir. 2015)). To give such effect, "[c]ontract terms are generally to be given their ordinary meaning when the terms are clear on

their face," and courts must "apply the plain language of the contract when the intent of the parties is evident from the clear and unambiguous language in a provision." *CoMa Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013). *See also Foster Wheeler Envirespponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

### a. The express warranty was disclaimed.

KMS argues that, to the extent it made an express warranty, such warranty was in the MSA and warranted only the quality of "tools, vehicles, machinery, and equipment used in connection" with furnishing the casing, and not the casing itself. (KMS Mot., PageID 9280.) In response, Antero argues, *inter alia*, that an express warranty was created by KMS's representations in the Work Order that it would provide casing that met API 5CT specifications. (ECF No. 112, Antero Resp., PageID 14830–31.)

Ohio's Uniform Commercial Code provides:

(A) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. . . .

R.C. § 1302.26(A).

The Work Order contains Antero's required production casing specifications, including API 5CT specifications. (ECF No. 80-4, Work Order, PageID 2285–2290.)

9

By assenting to the terms of the Work Order, KMS expressly warranted that the production casing would meet those specifications. *See Bobb Forest Prod., Inc. v. Morbark Indus., Inc.*, 783 N.E.2d 560, 574 (Ohio Ct. App. 2002) ("[A] seller's awareness of the customer's needs and affirmation that the product will meet those needs are sufficient to create an express warranty."). Thus, KMS's assent to the Work Order terms created an express warranty that it would provide API 5CT-compliant casing.

However, KMS disclaimed that express warranty. Under Ohio's Uniform Commercial Code:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of section 1302.05 of the Revised Code on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

R.C. § 1302.29(A). Any disclaimers must be conspicuous. *See Timken Co. v. MTS Sys. Corp.*, 539 F. Supp. 3d 770, 786 (N.D. Ohio 2021); § 1302.29(B). The Official Comment to R.C. § 1302.29 explains the purpose of restricting express warranty disclaimers:

> This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all warranties, express or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.

Thus, Ohio law permits a seller to negate or limit an express warranty if the disclaimer is conspicuous and reasonable. *Norcold, Inc. v. Gateway Supply Co.*, 2006

10

WL 3802609, *10 (Ohio Ct. App. Dec. 28, 2006); *Jones v. Davenport*, 2001 WL 62513, *7 (Ohio Ct. App. Jan. 26, 2001).

Here, there are two contractual provisions disclaiming KMS's express warranty. First, the Work Order that created the express warranty specified that KMS (as the seller/distributor) was to obtain a manufacturer warranty for the casing, stating: "Warranty implied or expressed: All items quoted are warranted by manufacturer." (Work Order, PageID 2285–90.) Second, the Sales Order between KMS and Antero provides:

> **Seller makes no warranty as to goods or equipment not manufactured, processed or assembled by it.** However, Seller's warranty herein shall not limit any warranties by the manufacturer which are available to Purchaser.
>
> \*\*\*
>
> . . . . NO REPRESENTATIONS, GUARANTIES, OR WARRANTIES, EXPRESS OR IMPLIED. . . . ARE MADE BY SELLER IN CONNECTION WITH THE MANUFACTURE OR SALE OF GOODS OR MATERIAL.

(ECF No. 80-4, Sales Order, PageID 2292 (emphasis in original).)

These disclaimers apply to any express warranty on the casing. They are reasonable because they made it clear to Antero at the time of contracting that KMS did not itself warrant that the casing met the required specifications. As required by § 1302.29, the disclaimer is conspicuous in boldface and capital letters amidst provisions that are in normal font. (See, Sales Order, PageID 2292.) *See Univ. Hosps. Health Sys., Inc. v. Pohl Inc. of Am.*, 358 F. Supp. 3d 658, 663–64 (N.D. Ohio 2019) (collecting Ohio cases on conspicuous disclaimers). If Antero did not like

11

the disclaimers, it could have re-negotiated the contract or gone elsewhere to find a different supplier.

This conclusion does not run afoul of the policy goals of R.C. § 1302.29 because it "is not a case where the buyer needed protection from unbargained-for and unexpected disclaimers, which is the purpose of requiring consistency between the express warranty and any disclaimer." *Zion Temple First Pentecostal Church of Cincinnati, Inc. v. Brighter Day Bookstore & Gifts*, 970 N.E.2d 441, 445 (Ohio Ct. App. 2004); *see also Jones*, 2001 WL 62513, *7. Antero is a competent commercial buyer who is practiced in soliciting bids for well products, purchasing such products, and negotiating the terms of the relevant agreements.[2] (See, ECF No. 112, PageID 14801–03.) It therefore needs no protection from "unbargained and unexpected disclaimers as the Code intended." *Rock Hill Mech., Inc. v. Liebert Corp.*, 707 F. Supp. 2d 998, 1005 (E.D. Mo. 2010).

Thus, KMS disclaimed the express warranty.

### b. The implied warranties were disclaimed.

Under Ohio's Uniform Commercial Code, implied warranties of merchantability and fitness for a particular purpose are assumed in a sale of goods. *Nordberg, Inc. v. Sylvester Material Co.*, 654 N.E.2d 1358, 1363 (Ohio Ct. App. 1995) (citing R.C. §§ 1302.27, 1302.28). However, those implied warranties can be excluded. *Id.*

---

[2]Antero does not dispute that it entered a commercial transaction or that it is a commercial buyer. *See* R.C. § 1302.01(A)(1).

12

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states for example, that 'There are no warranties which extend beyond the description on the face hereof.'

*Id.* (citing R.C. § 1302.29(B)).

Here, the Sales Order complies with § 1302.29(B) and disclaims all implied

warranties between KMS and Antero.

> **Seller makes no warranty as to goods or equipment not manufactured, processed or assembled by it.** However, Seller's warranty herein shall not limit any warranties by the manufacturer which are available to Purchaser.
>
> \*\*\*
>
> THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES AND NO REPRESENTATIONS, GUARANTIES OR WARRANTIES, EXPRESS OR IMPLIED, (INCLUDING, BUT NOT LIMITED TO, A WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), ARE MADE BY SELLER IN CONNECTION WITH THE MANUFACTURE OR SALE OF GOODS OR MATERIALS. NO EMPLOYEE, DISTRIBUTOR, OR REPRESENTATIVE IS AUTHORIZED TO CHANGE THIS WARRANTY IN ANY WAY OR GRANT ANY OTHER WARRANTY ON BEHALF OF SELLER. . . .

(Sales Order, PageID 2292) (emphasis in original).)

KMS did not manufacture, process, or assemble the defective casing, and the

warranty disclaimer specifically excludes the implied warranties of merchantability

and fitness for a particular purpose. The disclaimer is conspicuous. Thus, KMS

disclaimed all implied warranties.

### c.  The disclaimers are enforceable under Ohio law.

Antero argues that where goods contain a latent defect, warranty disclaimers that deprive the purchaser of the substantial value of its bargain are invalid, citing *WEL Companies, Inc., v. Haldex Brake Corp.*, 467 F.Supp. 3d 545 (S.D. Ohio 2020) (Sargus, J.). (Antero Resp., PageID 14835.)

*WEL Companies* addressed whether, in the face of otherwise properly disclaimed warranties, a disclaimer is unenforceable when the result is a limited remedy that is "unconscionable" or "fails of its essential purpose." *WEL Companies*, 467 F.Supp.3d at 563–65. In that case, the product contained a latent defect, and the court found that there was a genuine dispute of material fact over whether enforcement of the disclaimer would cause the remaining contractual remedy to fail its essential purpose by effectively depriving the buyer of any remedy. *Id.*

However, *WEL Companies* is distinguishable. Antero is not without remedy; it may seek recompense from Tejas for breach of warranty – and it has done so. As discussed below, there is no evidence that Tejas disclaimed all warranties. (ECF No. 94-9, Reyes Dep., PageID 9417 ("We do not disclaim any implied warranties."); ECF No. 78-1, Khandavelli Dep., PageID 630–31.) Indeed, this was the process bargained for and contemplated by KMS and Antero.

Accordingly, the Court finds that KMS's express and implied warranty disclaimers are valid and enforceable under Ohio law. KMS's Motion for Summary Judgment is **GRANTED** as to Counts I and III.

14

## 2.  Tort Claims under the OPLA (Counts VII and VIII)

The OPLA is a comprehensive product liability statutory scheme that was "intended to abrogate all common law product liability claims or causes of action." R.C. § 2307.71(B). The extent of this abrogation, however, depends on the statutory definition of a "product liability claim." An OPLA product liability claim is one that "seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or *physical damage to property other than the product in question....*" R.C. § 2307.71(A)(13) (emphasis added). Thus, claims seeking solely "economic loss" are not claims under the OPLA. *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996); *Federated Rural Elec. Mgmt. Corp. v. Electro Switch Corp.*, 2020 WL 3255144, at *2 (S.D. Ohio June 16, 2020). Economic loss is defined as "direct, incidental, or consequential pecuniary loss . . .," and includes physical damage to the defective product itself and nonphysical damage to other property. R.C. § 2307.71(A)(2); *Federated Rural Elec.*, at *2.

A plaintiff who has suffered only economic loss cannot sue in tort where privity of contract exists between the parties. *Federated Rural Elec.*, at *4. However, if a plaintiff seeks and recovers non-economic, compensatory damages under the OPLA, then economic loss can also be recovered even when the parties are in privity. *WEL Companies, Inc.*, 467 F. Supp. 3d at 558 (citation omitted); R.C. § 2307.79(B).

KMS argues that Antero cannot bring OPLA claims against it because Antero seeks only economic damages and the parties are in privity of contract. KMS also

15

argues that Antero waived its right to recover non-economic, compensatory damages and thus cannot sustain its OPLA claims because it is left with only economic damages. (KMS Mot., PageID 9285–88.) In response, Antero contends that it seeks compensatory damages for physical damage to the entire well, not just economic damage to the defective casing itself. (Antero Resp., PageID 14850.)

The Court need not reach KMS's waiver argument because none of the evidence cited by Antero establishes that there was physical damage to the well. Specifically:

1. Expert testimony of Dan Mason. During his deposition, Mr. Mason was asked a question in which counsel describes the investigation into the source of the casing failure as involving "damage to the well internally." (ECF No. 88-1, Mason Dep., PageID 5806.) Counsel's question is not evidence, and Mr. Mason's response establishes only that his current workload involved "review[ing] the facts of this matter," he does not adopt the premise that there was damage to the well. (*Id.*)

2. Expert testimony of John Callais. Mr. Callais testified in his deposition about "fluid damage." That testimony establishes only that determining whether there was fluid damage is an important factor in designing a casing patch; he does not conclude that the casing or the well actually suffered "fluid damage." (ECF No. 86-1, Callais Dep., PageID 4433.)

3. Expert testimony of Yuejin Luo. At his deposition, Mr. Luo discussed "ratty cement," which is cement situated between two layers of casing to

help maintain pressure in the internal casing. His testimony does not establish that fluid leaked into the cement. And he did not testify that the ratty cement suffered any physical damage. (ECF No. 99-1, Luo Dep., PageID 10505.)

4. Expert testimony of Gregg Perkins. During his deposition, Mr. Perkins referenced "string casing." (ECF No. 87-1, Perkin Dep., PageID 4825–26.) It is unclear what he meant or whether the "string casing" is different from the casing at issue in this case. Regardless, his testimony does not identify any physical damage to "string casing."

Thus, Antero has not established "physical damage to property other than the product in question," and is left instead with only economic damages. Because the parties are in privity of contract and Antero has only economic damages, Antero cannot sustain its OPLA claims. *See Federated Rural Elec.*, at *4.

Absent evidence of physical harm to the well, Antero relies on an Oklahoma case, *Red Rocks Res. L.L.C. v. Trident Steel Corp.*, 2017 WL 1322214 (W.D. Okla. Apr. 10, 2017), claiming that case establishes that, when an entire well is lost due to a casing failure, a plaintiff has suffered damage to other property (*i.e.*, the loss of the well) and can maintain a products liability action. Antero has lost the use of its well.

In *Red Rocks*, a plaintiff lost the use of its well due to defective production casing that failed during drilling operations. The plaintiff brought tort claims seeking damages for the casing and for the loss of the entire well. The defendant

argued that the economic loss doctrine barred recovery because only the casing itself was damaged; the court disagreed and found that the plaintiff's loss of the entire well was sufficient to overcome Oklahoma's economic loss rule. *Id.* at *1.

Here, however, Ohio law specifically requires that other property suffer *physical* damage. R.C. § 2307.71(A)(13). The *Red Rocks* court did not consider whether the damage suffered by the loss of the entire well was physical in nature or merely lost use. Even if it had, the Court cannot ignore that Ohio law, and here, Antero has no evidence of physical damage to anything but the casing itself.

KMS's Motion for Summary Judgment as to Counts VII and VIII is **GRANTED**.

### 3. Unpled Allegations

In response to KMS's motion, Antero argues that KMS breached its contracts with Antero. First, Antero argues that KMS failed to appropriately test the casing as required by the Work Order. (Antero Resp., PageID 14858.) Second, it argues that KMS failed to correct its "Work" as required by the MSA. (*Id.*, PageID 14854.) Antero did not allege these breaches of contract in its Complaint.

The Court will not consider new theories of liability at this time. *See Neumann v. Plastipak Packaging, Inc.*, 2011 WL 5360705, *11 (N.D. Ohio Oct. 31, 2011) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (citation omitted); s*ee also Guiffre v. Local Lodge No. 1124, United Steelworkers of America*, 940 F.2d 660 (6th Cir.

1991) ("A party may not rely on wholly new allegations of wrongdoing to resist a motion for summary judgment.").

### 4. KMS's Counterclaims against Antero

As discussed above, KMS and Antero entered into a partial settlement agreement by which KMS paid Antero $1,200,000, subject to a refund "[i]f it is proven to Antero's satisfaction that KMS, Tejas, and any third parties for whom they are responsible are not liable" for the casing failure. (ECF No. 1-2, Partial Settlement Agreement, PageID 32.) Specifically, KMS agreed to "aggressively pursue the insurers involved" with the casing failure and to pay Antero $1,200,000. (*Id.*) In return, Antero was to provide information to KMS about the claim and not plug the well for a period of time. (*Id.*)

KMS argues that the Prevention of Performance Doctrine, which provides that "a party who prevents another from performing its contractual obligations cannot rely on that failure of performance to assert breach of contract," governs its counterclaims.[3] *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 471 (Ohio 2018) (citing *Suter v. Farmers' Fertilizer Co.*, 126 N.E. 304, syllabus, ¶ 4 (Ohio 1919)). Under this Doctrine, the "[n]onperformance of a [contractual] condition is excused where performance thereof is prevented by the other party." *Dynes Corp. v. Seikel, Koly & Co.*, 654 N.E.2d 991, 1005 (Ohio Ct. App. 1994) (citation omitted).

---

[3]The Prevention of Performance Doctrine sounds in contract and does not apply to KMS's unjust enrichment or conversion claims. *See Lucarell*, 97 N.E.3d at 471. Accordingly, the Court construes KMS's motion for summary judgment as being on the declaratory judgment and breach of contract counterclaims only.

KMS contends that Antero's failure to remove the casing for inspection and subsequent abandonment of the well made it impossible for KMS to satisfy Antero that it, Tejas, and any third parties were not responsible for the claim. (ECF No. 94, KMS Mot., PageID 9294–95.) However, there is expert testimony that the casing need not be removed to investigate and determine the cause of the failure. (Malloy Dep., PageID 6127–28, 6149–50.) Thus, there is a genuine dispute over whether Antero's failure to remove the casing from the well actually prevented KMS's performance of the contract.

Accordingly, KMS's Motion for Summary Judgment on its counterclaims against Antero is **DENIED**.

### 5. KMS's Crossclaims against Tejas

In KMS's three crossclaims against Tejas, KMS seeks to recover from Tejas for any liability it might incur because of Antero's claims against it and for the $1,200,000 settlement payment it made to Antero. (ECF No. 16, KMS Answer, PageID 94–97.) KMS and Tejas both seek summary judgment on the crossclaims; the Court considers the two motions together.

The parties dispute whether Ohio or Texas law governs the crossclaims. Under Ohio law, a judgment must be rendered against the seller before it can seek indemnity from the manufacturer. *See O'Neill v. Showa Denko K.K.*, 655 N.E.2d 767, 769–70 (Ohio Ct. App. 1995). But under Texas law, judgment against the seller is not a precondition to the seller bringing an indemnity action; mere allegations in pleadings against the seller are enough to trigger the manufacturer's duty to

20

indemnify. *FLS Miljo, Inc. v. Munters Corp.*, 682 F. Supp. 2d 681, 689–90 (N.D. Tex. 2010); *see also* Tex. Civ. Prac. & Rem. Code §§ 82.001(2), 82.002(e).

### a. Texas law governs the crossclaims.

Federal courts sitting in diversity apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The forum state's choice-of-law rules determine which state's substantive law will apply. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). The parties agree that Ohio's choice of law provisions govern the crossclaims.

Ohio adheres to the Restatement (Second) of Conflicts for choice of law questions. *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 288–89 (Ohio 1984). The key issue is "which state has the most significant relationship to the occurrence and the parties." *In re Nat'l Century Fin. Enters.*, 846 F. Supp. 2d 828, 850–51 (S.D. Ohio 2012) (Graham, J.). Restatement (Second) Section 188(2) provides the following factors to consider: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*Place of contracting*. Comment (e) of the Section 188(2) defines the place of contracting as "the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect." Under Ohio law, "title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods." R.C. § 1302.42(B). The Sales Order Confirmation and invoices required Tejas to deliver the casing to

21

KMS "F.O.B." to Houston, Texas. (ECF No. 81-1, PageID 2908.) Delivery to Houston, then, was the required last act necessary to complete the contract between Tejas and KMS. The place of contracting is Texas.

*Place of negotiation*. This factor carries little weight, because the parties did not negotiate in one state; rather, they exchanged emails between Ohio and Texas. (ECF No. 114, PageID 14941.)

*Place of performance*. Because the place of manufacturing, contracting, and delivery is Texas, Tejas performed the contract in Texas. This factor strongly favors a determination that Texas law governs.

*Location of the subject matter*. The subject matter of the contract between Tejas and KMS was the casing – which was manufactured and delivered in Texas. This factor favors Texas law.

*Domicile*. Tejas is domiciled in Texas and KMS is domiciled in Ohio. This factor is neutral.

In sum, each factor is either neutral or favors a determination that Texas law governs KMS's Crossclaim. Tejas argues that the Court should consider that much of this dispute arose in Ohio, where the casing failure occurred. However, the relevant inquiry is into Tejas and KMS's contract to order the casing, not the events that happened after the casing was delivered.

As between Tejas and KMS, the casing was manufactured in Texas by a Texas manufacturer and was contracted for and delivered to KMS in Texas. Thus, Texas law applies.

22

Because Texas law applies, KMS cannot sustain its implied indemnity claims under Ohio common law. Tejas's Motion for Summary Judgment on the Ohio crossclaims is **GRANTED**.

### b. Tejas has a duty to indemnify KMS for a reasonable settlement payment, courts costs, attorney's fees, and expenses.

As for the remaining indemnity claim, Texas law provides that a manufacturer's statutory duty to indemnify an innocent seller includes reasonable settlement payments as well as "court costs and other reasonable expenses, reasonable attorney fees, and any reasonable damages." Tex. Civ. Prac. & Rem. Code § 82.002; *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 895 (Tex. 2010). This duty is triggered upon the assertion of a "product liability claim" against the seller, and without regard to whether the underlying claim is meritorious. *Meritor Auto. Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 91 (Tex. 2001). However, KMS must show that the settlement payment, court costs, attorney's fees, and expenses are reasonable. *FLS Miljo, Inc. v. Munters Corp.*, 682 F. Supp. 2d 681, 689–90 (N.D. Tex. 2010) (the seller bears the burden of showing that the settlement and costs, fees, and expenses are reasonable).

If KMS does not prevail against Antero at trial on its counterclaim for return of the settlement payment, then Tejas is liable to indemnify KMS for a reasonable settlement. Regardless of the outcome of its counterclaim, KMS is entitled to indemnity under Texas law for its reasonable costs, fees, and expenses incurred

defending against Antero's claims. *See id.*; *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d at 895.

KMS apparently assumes for purposes of its indemnity claim that its settlement payment will not be refunded and argues that Tejas cannot now challenge the reasonableness of the settlement amount, citing *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 670–71 (Tex. 2008). In *Evanston*, the court held that an insurance company could not challenge the reasonableness of a settlement when it wrongfully denied coverage prior to the settlement. *Evanston*, at 671. However, that holding is specific to insurers who had a contractual obligation to provide coverage but failed to do so. KMS provides no authority that the holding applies outside of the insurance context.

Tejas does dispute the reasonableness of the settlement, costs, fees, and expenses. "Reasonableness" is quintessentially a question for a jury and is not for the Court on summary judgment. *See Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 751–52 (Tex. App. 2005) ("The reasonableness of attorney fees is generally a question of fact for the jury's determination.") Accordingly, KMS's Motion for Summary Judgment on its crossclaims is **DENIED**. Tejas's Motion is **DENIED** as to KMS's crossclaim under Texas law and **GRANTED** as to the crossclaims under Ohio law.

## B. Conclusion

For the foregoing reasons, KMS's Motion for Summary Judgment is **GRANTED** as to Counts I, III, VII, and VIII of Antero's Complaint. KMS's Motion

for Summary Judgment on its counterclaim against Antero is **DENIED**. KMS's

Motion for Summary Judgment on its crossclaims against Tejas is **DENIED**.

## IV.    TEJAS TUBULAR'S MOTION FOR SUMMARY JUDGMENT

Tejas moves for summary judgment (ECF No. 101) on all of Antero's claims

against it.

### A. Analysis

#### 1.    Breach of Express Warranty (Count II)

Antero and Tejas dispute the source, substance, and scope of any express

warranty in this case. They also dispute whether such warranty was breached, and

whether the breach was the proximate cause of the damage. To prevail on summary

judgment, Tejas must prove the negative of at least one element of Antero's claim.

To succeed on a breach of warranty claim, Ohio law requires the plaintiff to

establish: "(1) the existence of a warranty; (2) the product failed to perform as

warranted; (3) the plaintiff provided the defendant with reasonable notice of the

defect; and (4) the plaintiff suffered an injury as a result of the defect." *Kehoe*

*Component Sales Inc. v. Best Lighting Prod., Inc.*, 933 F. Supp. 2d 974, 1003 (S.D.

Ohio 2013) (citation omitted); *See also* R.C. § 1302.89(B), Comment 5 (the breach of

warranty must be the proximate cause of the damages sought). The parties do not

dispute the notice element, and so the Court will address the other elements.

##### a.    An express warranty exists.

Tejas argues that Antero's Complaint bases the breach of express warranty

claim only on the MSA between KMS and Antero – and not on the Sales Order

Confirmation, to which Antero was a third-party beneficiary. (Tejas Mot., PageID 13379, Antero Resp., PageID 14913 (agreeing that Antero is a third-party beneficiary).) Therefore, Tejas contends, Antero's argument based on the Sales Order Confirmation is effectively an amendment of its Complaint. (Tejas Mot., PageID 13375.) Tejas's argument fails because Antero's Complaint alleges that the "contract" between *KMS and Tejas* created an express warranty to which Antero was entitled as a third-party beneficiary. (Antero Compl., PageID 7.)

And Tejas concedes as much. (Tejas Mot., PageID 13376; Tejas Reply, PageID 15235.) It acknowledges that it warranted to "[p]rocess [the casing] per API 5CT Latest Edition Specifications." (ECF No. 81-1, Sales Order Confirmation, PageID 2883.) Tejas disputes the scope of its warranty to "process" the casing, but regardless, the Court cannot grant summary judgment on the grounds that no express warranty existed between Tejas and Antero.

### b. There is a genuine dispute over whether the product performed as warranted and over whether Antero suffered an injury as a result of the defect.

Tejas argues that it did not breach the express warranty to process the casing per API 5CT specifications because it took appropriate measures to treat the casing, and because the casing passed all Tejas's inspections and tests. Antero responds that, if the casing met the required API 5CT specification and was free of manufacturing defects, it would not have failed Antero's pressure test at 10,838 psi. (Antero Resp., PageID 14911.)

Antero provides evidence supporting its argument; Antero expert Mr. Hadjioannou testified, "I can tell you that within reasonable engineering probability, I'm very confident that this was a manufacturing defect and, in all likelihood, it was a cold weld or a series of quench cracks that led to this failure." (ECF No. 90-1, Hadjioannou Dep., PageID 6708; See also, PageID 6653.) Mr. Hadjioannou arrived at this conclusion based on his professional experience investigating well failures. "I have done hundreds of failures and, based on my knowledge of fracture mechanics and forensic engineering and the way materials behave, I have deduced that it is only likely that a manufacturing defect led to this failure, nothing else." (*Id.*, PageID 6710.) This is sufficient to create a jury question over whether the product performed as warranted.

Tejas disputes the validity of Mr. Hadjioannou's conclusion, in part, because the casing was not retrieved from the well for inspection. But Tejas's own expert said that, in his experience, defective casing is recovered for testing and analysis only 25 percent of the time and that such failure does not prevent an investigator from reaching a conclusion as to the cause of the casing problems. (ECF No. 89-1, Malloy Dep., PageID 6127–28, 6150.) In his words, it is "just an added bonus" if the casing is retrieved. (*Id.*, PageID 6150.)

Tejas also argues that its experts concluded differently than Antero's. They found, among other things, that "fatigue" to the casing due to its "reciprocating and rotating" in the well was the likely cause of the failure. (ECF No. 91-1, Hansen Dep., PageID 8573.) However, contrary expert opinions do not discredit the validity

of Antero's experts. *See Grover v. BMW of N. Am., LLC*, 2022 WL 204925, at *5

(N.D. Ohio Jan. 24, 2022) (citing *Sanford v. Russell*, 387 F. Supp. 3d 774, 785 (E.D.

Mich. 2019) ("contradictory opinion evidence does not render an expert's testimony

unreliable, but 'merely establishes a fact dispute' "). Rather, dueling expert reports

create a genuine dispute of material fact regarding the cause of the casing failure.

Resolution of this issue is fit for trial, where parties can engage in "vigorous cross-

examination" and present contrary evidence to the jury. *Sanford*, 387 F. Supp. at

785 (E.D. Mich. 2019) (citing *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509

U.S. 579, 595 (1993)).

Tejas's Motion for Summary Judgment on Count II is **DENIED**.

## 2. Breach of Implied Warranty of Merchantability (Count III)

As previously discussed, Ohio's Uniform Commercial Code provides that

contracts for sale of goods include an implied warranty that the goods shall be

merchantable, unless the warranty is otherwise excluded or modified. R.C.

§1302.27(A). This means the goods must:

> (a) pass without objection in the trade under the contract description; and
>
> (b) in the case of fungible goods, be of fair average quality within the description; and
>
> (c) be fit for the ordinary purposes for which such goods are used; and
>
> (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
>
> (e) be adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

R.C. §1302.27(B).

Tejas concedes that there is an implied warranty of merchantability on the casing. The above analysis on the express warranty applies to the warranty of merchantability – whether the warranty was breached is subject to debate among the parties' experts and is a jury question. *See Grover*, 2022 WL 204925, at *5.

Tejas's Motion for Summary Judgment as to Count III for breach of implied warranty of merchantability is **DENIED**.

### 3. Breach of Implied Warranty of Fitness for Particular Purpose (Count III).

A warranty of fitness for a particular purpose exists in a sale of goods where "(1) the seller has 'reason to know the buyer's particular purpose'; (2) the seller has 'reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods'; and (3) the 'buyer must, in fact, rely upon the seller's skill or judgment.'" *Leen v. Wright Med. Tech., Inc.*, 2015 WL 5545064, *2 (S.D. Ohio Sept. 18, 2015) (Rice, J.) (citing *Hollingsworth v. Software House, Inc.*, 513 N.E. 2d 1372 (Ohio Ct. App. 1986); R.C. § 1302.28.

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.

Official Comment 2, R.C. § 1302.28.

Tejas argues that there is no implied warranty of fitness for a particular purpose on the casing because it was not aware of the particular conditions or pressures under which the casing would be used in Wehr 3H well. It further argues that Antero did not rely on Tejas's skill or judgment to select or furnish suitable goods. (Tejas Mot., PageID 13381.)

Here, there is evidence that Tejas knew the casing ordered by KMS would be furnished to Antero. (ECF No. 78-1, Khandavelli Dep., PageID 468–69, 547.) It also knew that such casing needed to meet API 5CT specifications for use in high-pressure hydraulic fracking wells. (ECF No. 81-1, Reyes Dep., PageID 2816; Khandavelli Dep., PageID 468-69; ECF No. 93, Tejeda Dep., PageID 8790–91.) On the other hand, Antero knew that Tejas was the manufacturer because it was identified as such on the RFQ and Work Order. (RFQ, PageID 1299–1307; Work Order, PageID 12212–17.) Tejas, then, knew of Antero's particular purpose for the casing, who was relying on Tejas's skill as manufacturer to produce and furnish API 5CT-compliant casing. (ECF No. 100-1, Kilstrom Dep., PageID 12037–38 ("[W]e rely on KMS and their suppliers to provide a properly spec'd certified piece of pipe that's going to withstand 14,530 burst pressure.").) Thus, an implied warranty of fitness for a particular purpose was created.

Having found an implied warranty of fitness for a particular purpose in effect, there is a genuine dispute about whether this warranty was breached for the same reasons discussed above.

Tejas Motion for Summary Judgment as to Count III for breach of implied warranty of fitness for a particular purpose is **DENIED**.

### 4. Tort Claims

Tejas argues that it is entitled to summary judgment on Antero's OPLA and breach of implied warranty in tort claims because Antero cannot sustain them as a matter of law.

### a.        OPLA Claims (Counts V and VI)

Antero brings an OPLA claims against Tejas. As discussed above, Antero has not provided any evidence that property other than the casing itself suffered physical harm, as is necessary to sustain its OPLA claims. (Tejas Reply, PageID 15246.) Tejas's Motion for Summary Judgment as to Counts V and VI is **GRANTED**.

### b.        Breach of Implied Warranty in Tort (Count IV)

If a plaintiff cannot recover economic losses under the OPLA, such losses may still be recoverable at common law. R.C. § 2307.72(C); *LaPuma*, 661 N.E.2d at 716; *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 753 n.4 (Ohio Ct. App. 2016). However, economic loss damages are generally not recoverable in tort if the economic loss stems from the breach of a contractual duty. *Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005). "When a purchaser negotiates the purchase of a product, and that product fails to meet expectations, the economic loss rule and Ohio's product liability statute limit the purchaser to its contract remedies." *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d

1025, 1031 (6th Cir. 2003). Commercial parties in privity of contract cannot sue for economic damages under Ohio common law. *See WEL Companies, Inc.*, 467 F. Supp. 3d at 560–62 (collecting cases).

Here, Antero is a commercial buyer of Tejas's casing for commercial use in its well. The parties do not dispute that they are in privity of contract. (Tejas Mot., PageID 13379; Antero Resp., PageID 14913.) *See Norcold, Inc. v. Gateway Supply Co.*, 798 N.E.2d 618, 628 (Ohio Ct. App. 2003) (there is privity of contract between manufacturer and buyer if the buyer is the intended third-party beneficiary of a contract). Because the casing defect stemmed from Tejas's alleged breach of its contractual duty, Ohio law precludes Antero's common law tort claim. *See Midwest Ford, Inc. v. C.T. Taylor Co.*, 694 N.E.2d 114, 116–17 (Ohio Ct. App. 1997) ("[T]he common-law action in tort for purely economic loss from defective products, based upon implied warranty theory, is not available to commercial buyers.").

Accordingly, Tejas's Motion for Summary Judgment as to Count IV is **GRANTED**.

### 5. Limitation on Damages

Tejas argues that if the Court denies its summary judgment motion on Antero's claims for breach of express warranty (Count II) and breach of implied warranties of merchantability and fitness for a particular purpose (Count III), then Antero's damages are limited by the Ohio UCC. (ECF No. 101, Tejas Mot., PageID 13381.)

Antero and Tejas each put forth evidence as to the measure, amount, and type of damages that Antero may be entitled to. Antero argues that expert testimony establishes that the cost of repair is higher than the value of the well, and that it is therefore entitled to the entire value of the well. (ECF No. 87-1, Perkins Dep., PageID 4884.) Tejas rebuts Antero's expert evaluation of the damages because it omits consideration of reasonable alternative repair methods. (Perkins Dep., PageID 4885, 4962–63.) Tejas also provides evidence that Antero's attempt to retrieve the casing was unreasonable and thus should not be considered as part of the damages. (ECF No. 90-1, Hadjioannou Dep., PageID 6560–62.)

Like many issues in this case, there exist genuine disputes of fact over the measure, amount, and type of damages incurred by Antero. Such questions are best suited for a jury. Accordingly, Tejas's motion for summary judgment as to limitation on damages is **DENIED**.

### B. Conclusion

For the foregoing reasons, Tejas's Motion for Summary Judgment on Counts II and III and for limitation of Antero's damages is **DENIED**. Summary judgment is **GRANTED** on Counts IV, V, and VI.

## V. CONCLUSION

For the foregoing reasons, KMS's Motion for Summary Judgment is **GRANTED** as to Counts I, III, VII, and VIII of Antero's Complaint. KMS's Motion for Summary Judgment on its counterclaims and crossclaims is **DENIED**. Tejas's Motion for Summary Judgment on Antero's Counts II and III and for limitation of

damages is **DENIED**, but is **GRANTED** on Antero's Counts IV, V, and VI. Tejas's

Cross-Motion for Summary Judgment on KMS's crossclaims is **DENIED in part**

and **GRANTED in part**. Tejas's request for oral argument is **DENIED**.

Thus, the following claims remain for trial:

1. KMS's counterclaims against Antero for return of the settlement payment;

2. KMS's crossclaim against Tejas for statutory indemnity under Texas law;

3. Antero's claim against Tejas for breach of express warranty; and

4. Antero's claim against Tejas for breach of implied warranties of merchantability and fitness for a particular purpose.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**